UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KORY DARTY,

                    Petitioner,

          v.

J. SOTO, Warden,

                    Respondent.

No.  2:13-cv-02572 TLN AC P

FINDINGS AND RECOMMENDATIONS

Petitioner is a California state prisoner proceeding pro se and in forma pauperis with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The action proceeds on the petition filed on December 5, 2013, ECF No. 1, which challenges petitioner's 2010 conviction for one count of attempted murder with use of a firearm resulting in great bodily injury, and three counts of attempted murder with use of a firearm.  Respondent has answered, ECF No. 13, and petitioner has filed a traverse, ECF No. 21.

BACKGROUND

I.       Trial Court Proceedings

The following statement of the case is taken from the unpublished opinion of the California Court of Appeal on direct review:[1]

---

[1]  The undersigned has independently reviewed the trial record, and confirms the accuracy of the state court's recitation of the evidence presented at trial.

1

A.   <u>Procedural and Factual Background</u>

A jury convicted Darty of four counts of attempted murder (Pen. Code, §§ 664, 187, subd. (a)—counts one through four).[2]   As to count one, the jury found Darty personally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)) and as to counts two, three, and four that he personally discharged and used a firearm (§§ 12022.5, subd. (a)(1), 12022.53, subds. (b), (c)).

Sentenced to state prison for 50 years to life, defendant appeals contending (1) the evidence is insufficient to support the attempted murder convictions in counts two, three, and four; (2) the trial court erred in denying his motion to suppress his identification from a photo lineup; (3) the court erred when it failed, sua sponte, to instruct the jury on attempted voluntary manslaughter as an included offense of the attempted murders charged in all counts; and (4) the prosecutor committed prejudicial misconduct.   We reject the contentions and affirm the judgment.

<u>Facts</u>[3]

In November 2008, defendant was living at the Azure Park Apartments (Azure Apartments) on Sky Parkway in Sacramento. Defendant sold marijuana and was known as "D," "KD," and "the Weed Man."  Charles W., Donnell A., Sidney W., and Jonathan F. (all teenagers) hung around the Azure Apartments and also sold marijuana.

In the early evening on November 18, 2008, Charles, Donnell, Jonathan, and Sidney were at a market across the street from the Azure Apartments when, based upon a prior problem, Donnell slapped and/or punched Syra Drones, a young female who was involved with defendant.  Drones was angry, crying, and threatened to tell defendant what had happened.  She also threatened to return with a gun and then walked off into the Azure Apartments.

About 30 minutes after the fight with Drones, Charles and his group were standing in front of the Azure Apartments when two men walked toward them asking for some "tree" or "weed," meaning marijuana.   Jonathan gave Charles a bag of marijuana to sell to them and Charles walked away toward the two.  Charles recognized one of the men as defendant, having met him in Charles's aunt's apartment in the complex, but Charles did not know the other man.

Charles gave defendant's companion a bag of marijuana and as that man was handing Charles the money, defendant started shooting at Charles. Defendant's companion joined in the shooting and Charles was shot five to six times and fell to the ground.  Charles had gunshot wounds to his abdomen, lower back, left arm, left leg, and bottom of his left foot.

---

[2]  [Fn. 1 in original excerpted text].  Undesignated section references are to the Penal Code.
[3]  [Fn. 2 in original excerpted text].  The facts are further developed as required by the issues.

Devon Washington, who knew defendant, Charles, Sidney, and Jonathan, testified that he came out of the market and saw Charles, Sidney, and Jonathan across the street in front of the Azure Apartments. Charles was talking to two men. Washington watched as the two men started backing away from Charles as they were shooting him with handguns. From the light generated by the muzzle flashes of the guns, Washington identified defendant, who was wearing a black sweatshirt with the hood up, as one of the shooters. Washington thought he heard "at least 20" gunshots.

Sidney, Jonathan, and Donnell testified that after the shooting started, they ran and heard the bullets striking the metal gate near them. Donnell testified that for a shooter to have shot at them after shooting at Charles, "[h]e would have had to turn the gun to be facing towards us." Neither Sidney, Jonathan nor Donnell was shot, and they escaped by running into the apartment complex.

Jason Lyle knew defendant from having purchased marijuana from him. The night of the shooting, Lyle called defendant and arranged to buy marijuana from him. Lyle arrived at the Azure Apartments, parked his car and walked over to defendant and bought marijuana from him. As the two were talking, defendant told Lyle to "hold on real quick" and walked away. As Lyle waited he heard gunshots. Defendant returned with a man in a wheelchair, and the two got into Lyle's car. Defendant was wearing gloves and had a gun, and Lyle thought he was wearing dark clothing. Defendant told Lyle, "Let's go." When Lyle just sat there, defendant and the other man got out of the car and left.

At trial, Donnell claimed he was unable to identify defendant as one of the shooters, but admitted that he had told a police officer that he "saw the people who were shooting." Detective Robert Stewart testified that in audio/video recorded statements, Donnell identified defendant as one of the shooters and said that he was wearing a "black hoodie" and gloves.

Emergency personnel transported Charles to a hospital where he remained for approximately two months.[4] As a result of his injuries, Charles is paralyzed from the waist down. Crime scene investigators found 17 expended shell casings, seven of which were .380–caliber and were fired from the same gun, the other 10 were .25–caliber and were fired from two guns. No fingerprints were found on the casings.

Lodged Doc. 4, Exhibit A to Answer to Petition, pp. 1-2, People v. Darty, No. C065494, 2012 WL 4056249, at *1-2 (Cal. Ct. App. Sept. 17, 2012) (unpub.), People v. Darty, No. C065494, 2012 Cal. App. LEXIS 6728, at *1-5 (Ct. App. Sept. 17, 2012) (unpub).

During the trial, petitioner's girlfriend testified for the defense that petitioner was in her

---

[4]  A review of the record indicates Charles was in the hospital for approximately three months.  1 RT at 123.

1  apartment when the shots were fired.  4 RT 914-916.[5]  Petitioner did not testify at his trial.

2    II.    Post-Conviction Proceedings

3    Petitioner timely appealed, and the California Court of Appeal affirmed the judgment of

4  conviction on September 17, 2012.  Lodged Doc. 4.  The California Supreme Court summarily

5  denied review on December 19, 2012.  Lodged Doc. 6.  Petitioner did not seek collateral review

6  in state court.

7    By operation of the prison mailbox rule, the instant federal petition was filed December 5,

8  2013.[6]  ECF No. 1.  Respondent answered on May 22, 2014.  ECF No. 13.  Petitioner's traverse

9  was docketed on September 29, 2014.  ECF No. 21.

10    STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

11    28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of

12  1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

20    The statute applies whenever the state court has denied a federal claim on its merits,

21  whether or not the state court explained its reasons.  Harrington v. Richter, 131 S. Ct. 770, 785

22  (2011).  State court rejection of a federal claim will be presumed to have been on the merits

23  absent any indication or state-law procedural principles to the contrary.  Id. at 784-85 (citing

24  Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is

25  unclear whether a decision appearing to rest on federal grounds was decided on another basis)).

---

[5]  "RT" refers to the Reporter's Transcript on Appeal, Volume One ("1 RT") through Volume Four ("4 RT").

[6]  See Houston v. Lack, 487 U.S. 266 (1988) (establishing rule that a prisoner's court document is deemed filed on the date the prisoner delivered the document to prison officials for mailing).

1    "The presumption may be overcome when there is reason to think some other explanation for the

2    state court's decision is more likely." Id. at 785.

3          The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal

4    principle or principles" previously articulated by the Supreme Court. Lockyer v. Andrade, 538

5    U.S. 63, 71-72 (2003). Only Supreme Court precedent may constitute "clearly established

6    Federal law," but courts may look to circuit law "to ascertain whether…the particular point in

7    issue is clearly established by Supreme Court precedent." Marshall v. Rodgers, 133 S. Ct. 1446,

8    1450 (2013).

9          A state court decision is "contrary to" clearly established federal law if the decision

10   "contradicts the governing law set forth in [the Supreme Court's] cases." Williams v. Taylor, 529

11   U.S. 362, 405 (2000). A state court decision "unreasonably applies" federal law "if the state

12   court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to

13   the facts of the particular state prisoner's case." Id. at 407-08. It is not enough that the state court

14   was incorrect in the view of the federal habeas court; the state court decision must be objectively

15   unreasonable. Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

16        Review under § 2254(d) is limited to the record that was before the state court. Cullen v.

17   Pinholster, 131 S. Ct. 1388, 1398 (2011). The question at this stage is whether the state court

18   reasonably applied clearly established federal law to the facts before it. Id. In other words, the

19   focus of the § 2254(d) inquiry is "on what a state court knew and did." Id. at 1399. Where the

20   state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is confined to "the

21   state court's actual reasoning" and "actual analysis." Frantz v. Hazey, 533 F.3d 724, 738 (9th

22   Cir. 2008) (en banc). A different rule applies where the state court rejects claims summarily,

23   without a reasoned opinion. In Richter, supra, the Supreme Court held that when a state court

24   denies a claim on the merits but without a reasoned opinion, the federal habeas court must

25   determine what arguments or theories may have supported the state court's decision, and subject

26   those arguments or theories to § 2254(d) scrutiny. Richter, 131 S. Ct. at 786.

27   ////

28   ////

1

DISCUSSION

2    I.    Claim One:  Sufficiency of the Evidence for Counts Two through Four of Attempted

3          Murder

4          A.  Petitioner's Allegations and Pertinent State Court Record

5        Petitioner contends that there was insufficient evidence to support his conviction for the

6 attempted murder of Sidney W., Donnell A., and Jonathan F., under both a "kill zone" theory and

7 a direct intent theory of attempted murder, ECF No. 1 at 4 and ECF No. 21 at 17-18.[7]  Petitioner

8 asserts that he is an "outsider" without a motive to kill the victims, and that because Sidney,

9 Donnell, and Jonathan were not hurt, the "kill zone" theory is "exaggerated."  ECF No. 21 at 18.

10 Petitioner further asserts that none of these three victims identified him in court as the shooter;

11 Donnell testified he lied to police when he originally identified petitioner as the shooter; and there

12 is no physical evidence tying petitioner to the shooting, ECF No. 21 at 16-18.

13        At trial, the prosecution theorized that petitioner attempted to kill Charles Walker and his

14 friends either in retaliation for an earlier attack on Syra Drones, with whom petitioner had a

15 relationship, or because Charles and his friends were selling marijuana at the apartment complex,

16 thus infringing on petitioner's "territory."  4 RT 1035, 1115.  The prosecution presented witness

17 testimony in support of these possible motives.  See 1 RT 97; 2 RT 341, 446-447; 2 RT 563-569.

18 The trial transcript reflects that after firing on Charles, petitioner and his companion turned their

19 guns and fired 11 to 12 more times in the direction of the three other victims, 2 RT 335, 3 RT

20 646; investigators found 17 expended gun casings at the scene, 2 RT 485-488; and the victims

21 heard metal strike the gate behind them as they ran, 1 RT 259, 2 RT 354, 461.

22          B.  The Clearly Established Federal Law

23        Due process requires that each essential element of a criminal offense be proven beyond a

24 reasonable doubt.  United States v. Winship, 397 U.S. 358, 364 (1970).  In reviewing the

25 sufficiency of evidence to support a conviction, the question is "whether, viewing the evidence in

26 the light most favorable to the prosecution, *any* rational trier of fact could have found the essential

27

28 [7]  The referenced pagination is to the court's electronic copy of the parties' pleadings.

1   elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1974)

2   (emphasis in original).  If the evidence supports conflicting inferences, the reviewing court must

3   presume "that the trier of fact resolved any such conflicts in favor of the prosecution," and the

4   court must "defer to that resolution." <u>Id.</u> at 326; <u>see also</u> <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274-

5   75 (9th Cir. 2005) (reviewing <u>Jackson</u> claim under AEDPA standards).  A jury's credibility

6   determination is not subject to review during post-conviction proceedings.  <u>Schlup v. Delo</u>, 513

7   U.S. 298, 330 (1995) ("under <u>Jackson</u>, the assessment of the credibility of witnesses is generally

8   beyond the scope of review.").  The federal habeas court determines the sufficiency of the

9   evidence in reference to the substantive elements of the criminal offense as defined by state law.

10  <u>Jackson</u>, 443 U.S. at 324 n.16.

11          In order to grant a writ of habeas corpus under the AEDPA, the court must find that the

12  decision of the state court was an objectively unreasonable application of <u>Jackson</u> and <u>Winship</u> to

13  the facts of the case.  <u>Juan H.</u>, 408 F.3d at 1274.  Because the <u>Jackson</u> standard is itself

14  deferential, the AEDPA creates a "double dose of deference."  <u>Boyer v. Belleque</u>, 659 F.3d 957,

15  964 (9th Cir. 2011).  The question is not whether this court finds the evidence insufficient, or

16  whether the state court made a mistake, but whether the state court's determination that a rational

17  jury could have found sufficient evidence to find each element of the crime proven beyond a

18  reasonable doubt was objectively unreasonable.  <u>Id.</u> at 965.

19          C.  <u>The State Court's Ruling</u>

20          Petitioner raised his sufficiency of the evidence claim on direct appeal.  Because the

21  California Supreme Court denied discretionary review, the opinion of the California Court of

22  Appeal for the Third Appellate District constitutes the last reasoned decision on the merits and is

23  the subject of habeas review in this court.  <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797 (1991); <u>Ortiz v.</u>

24  <u>Yates</u>, 704 F.3d 1026, 1034 (9th Cir. 2012).  The California Court of Appeal ruled as follows:

25              Defendant contends the convictions for attempted murder of Sidney
                (count two), Donnell (count three), and Jonathan (count four) must
26              be reversed because the evidence is insufficient to establish either
                an intent to kill each of them or that they were in a "kill zone,"
27              which is a group of persons into which shots are intentionally being
                fired.  We conclude the evidence is sufficient to establish a direct
28

7

intent to kill each victim and, therefore, we need not address the kill zone theory.

"'In reviewing the sufficiency of the evidence to support a judgment of conviction, we examine the entire record in the light most favorable to the prosecution, presuming in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence, to determine whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt.'" (People v. Coffman (2004) 34 Cal. 4th 1, 87.)

In People v. Stone (2009) 46 Cal. 4th 131, the court explained the two theories of attempted murder—the intent to kill a specific person and the kill zone theory.  "'Someone who in truth does not intend to kill a person is not guilty of that person's attempted murder even if the crime would have been murder ... if the person were killed.  To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else.  The defendant's mental state must be examined as to each alleged attempted murder victim.  Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of attempted murder of the victim, but not of others.'"[8] (Id. at p. 136.).

Although defendant claims the prosecution "[i]n the instant case relied on the kill zone theory to establish the attempted murder of [Charles's] three companions," the record shows the prosecutor also argued that defendant specifically attempted to kill each victim, i.e., a direct kill theory.  The prosecutor posited two potential motives for the shootings—defendant's anger at Charles and his companions for the assault on Syra Drones (with whom he had been sexually involved), and his displeasure with Charles's group for selling marijuana on defendant's territory.  The prosecutor then argued that for either of these reasons the shooters not only intended to kill Charles, but after shooting him "they turn [their] guns and shoot at the other kids that are there," which is a direct

---

[8]  [Fn. 3 in original excerpted text].  Stone went on to explain, "[H]owever, ... if a person targets one particular person, under some facts a jury could find the person *also,* concurrently, intended to kill—and thus was guilty of attempted murder of—other, nontargeted persons.  [In] Ford v. State (1993) 330 Md. 682, we explained that 'the fact the person desires to kill a particular target does not preclude finding that the person also, concurrently, intended to kill others within what [the Ford court] termed the "kill zone."'  For example, if a person placed a bomb on a commercial airplane intending to kill a primary target, but also ensuring the death of all the passengers, the person could be convicted of the attempted murder of all the passengers, and not only the primary target.  Likewise, in [People v. Bland (2002) 28 Cal. 4th 313], '[e]ven if the jury found that defendant primarily wanted to kill [a driver] rather than [the] passengers, it could reasonably also have found a *concurrent* intent to kill those passengers when defendant and his cohort fired a flurry of bullets at the fleeing car and thereby created a kill zone.  Such a finding fully supports attempted murder convictions as to the passengers.'" (People v. Stone, supra, 46 Cal. 4th at p. 137, original italics.).

attempt to kill theory.[9]   The jury was instructed pursuant to CALCRIM No. 600, on both theories of attempted murder.[10]

The evidence is sufficient that the shooters were specifically attempting to kill Charles, Donnell, Sidney, and Jonathan.  After having shot Charles five to six times at close range, a clear indication of their intent to kill him, the shooters then turned their fire and shot at least 11 to 12 more times in the direction Donnell, Sidney, and Jonathan were running.  The 17 expended casings found at the scene and the trio of victims hearing the bullets striking the metal gate as they ran adequately established the shooters' intent to kill each victim.  Consequently, we conclude the evidence is sufficient to support attempted murder convictions in counts two, three, and four on the theory of a specific intent to kill each victim.

Our conclusion renders it unnecessary for us to address defendant's contention the evidence is insufficient to support the attempted murders in counts two, three, and four on a kill zone theory. (See People v. Guiton (1993) 4 Cal. 4th 1116, 1129 ["If the inadequacy of proof is purely factual, of a kind the jury is fully equipped to detect, reversal is not required whenever a valid ground for the

---

[9]  [Fn. 4 in original excerpted text].  The prosecutor also argued that it did not matter whether the shooters intended to kill any specific companion of Charles's who were grouped nearby if the evidence showed that the shooters, or anyone of them, fired several shots into the group, which was a kill zone theory.

[10]  [Fn. 5 in original excerpted text].  The court instructed the jury on attempted murder pursuant CALCRIM No. 600:

"The defendant is charged in Counts 1–4 with attempted murder.  To prove that the defendant is guilty of attempted murder, the People must prove that:  [¶] 1. The defendant took direct but ineffective steps toward killing another person; and [¶] 2. The defendant intended to kill that person.  [¶] A *direct step* requires more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder.  A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action.  A direct step indicates a definite and unambiguous intent to kill.  It is a direct movement toward the commission of the crime after preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt.  [¶] A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.'  In order to convict the defendant of the attempted murder of a charged victim, the People must prove that the defendant not only intended to kill the charged victim but also either intended to kill the charged victim, or intended to kill everyone within the kill zone.  If you have a reasonable doubt whether the defendant intended to kill the charged victim or intended to kill the charged victim by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of the charged victim." (Original italics.)

1
2

verdict remains, absent an affirmative indication in the record that
the verdict did not rest on the inadequate ground"].)

3

Lodged Doc. 4 at 2-3.

4

       D.  Objective Reasonableness Under § 2254(d)

5

      The California Court of Appeal applied the correct standard of review to petitioner's

6

sufficiency of the evidence claim and did so reasonably.  Although the court did not cite federal

7

authority in its analysis, the standard for reviewing the sufficiency of the evidence to support a

8

conviction is the same under California and federal law.  See People v. Coffman, 34 Cal. 4th 1,

9

87, as modified (Oct. 27, 2004).  Specifically, the court found that the evidence, viewed in the

10

light most favorable to the prosecution, was sufficient for a rational trier of fact to find petitioner

11

guilty of the attempted murder of Sidney, Donnell, and Jonathan (counts two through four).

12

      Under California law, attempted murder requires the intent to kill and the commission of a

13

direct but ineffectual act toward accomplishing that goal.  People v. Stone, 46 Cal. 4th 131, 136

14

(2009).  The "intent" element usually requires an examination of the defendant's mental state for

15

the specific intent to kill the alleged victim.  Id. at 136-37.  However, as the California Court of

16

Appeal explained, a jury may also infer "concurrent intent" under a "kill zone" theory of

17

attempted murder.  Id. at 137.

18

      The court reasonably found sufficient evidence to support a "direct kill" (or direct intent)

19

theory of attempted murder and therefore did not need to reach the sufficiency of the evidence on

20

a "kill zone" theory.  As found by the court, the physical and testimonial evidence, viewed in the

21

light most favorable to the prosecution, provided a rational basis for the jury to find that petitioner

22

intended to kill victims Sidney, Donnell, and Jonathan.  The number of bullets fired after Charles

23

was shot, in combination with petitioner's possible motives and the victims' testimony that they

24

heard metal strike the gate behind them as they ran, is enough for a rational jury to conclude that

25

petitioner harbored the requisite intent.  The prosecution presented evidence of two different

26

possible motives for petitioner's direct intent to kill the three victims, and it is for the jury to

27

weigh those theories against any evidence that petitioner was an "outsider" without a motive, or

28

that the "kill zone" theory was "exaggerated."  See Jackson, 443 U.S. at 319.  Concluding that the

1   evidence was sufficient to support petitioner's attempted murder convictions in counts two, three,

2   and four on the theory of a specific intent to kill each victim, it was unnecessary for the court of

3   appeal to reach petitioner's alternate challenge to the evidence under the "kill zone" theory.[11]

4          Petitioner asks this court to revisit the credibility of the witnesses and make its own

5   determination of the evidence.  This is beyond the scope of this court's authority.  See Schlup,

6   513 U.S. at 330; see also United States v. Kranovich, 401 F.3d 1107, 1112-13 (9th Cir. 2005)

7   (credibility of witnesses falls within the exclusive province of the jury and may not be revisited

8   by reviewing court).  Petitioner's argument that alternate conclusions could be drawn from the

9   evidence is without consequence.  A mere possibility of a different conclusion does not render the

10  court's analysis unreasonable.  See Long v. Johnson, 736 F.3d 891, 896 (9th Cir. 2013)

11  ("Although the evidence presented at trial could yield an alternative inference, we 'must respect

12  the exclusive province of the [jury] to determine the credibility of witnesses, resolve evidentiary

13  conflicts, and draw reasonable inferences from proven facts.'" (internal citations omitted)).

14         Petitioner's further arguments challenge the evidence establishing that he was one of the

15  shooters.  See ECF No. 21 at 15-18.  In support of this contention, petitioner notes that victims

16  Sidney, Donnell, and Jonathan did not identify him in court, that Donnell testified that he lied to

17  police when he identified petitioner as one of the shooters, and that none of the bullet casings

18  found at the scene contained fingerprints and none were linked to any weapon belonging to

19  petitioner.  Id.  However, the California Court of Appeal was not objectively unreasonable in

20  finding that a rational jury could have reached the conclusion that petitioner was guilty of counts

21  two through four even in light of these facts.  As discussed further below in addressing

22  petitioner's second claim, at trial both Charles Walker and Devon Washington identified

23  petitioner as the shooter.  1RT 96-97, 1 RT 200-201.  Jason Lyle testified that after he heard the

24  gunshots, he observed petitioner wearing gloves and holding a gun.  3 RT 611-612.  It was for the

25  jury to weigh and resolve conflicts in the testimony and to draw reasonable inferences from the

26  
_____

27  [11]  The California Court of Appeal noted that the trial court gave the jury instruction CALCRIM
    No. 600, which includes both theories of attempted murder.  CALCRIM No. 600 states: "…the
    People must prove that the defendant not only intended to kill the charged victim but also either
28  intended to kill the charged victim, or intended to kill everyone within the kill zone."

1   evidence.  Jackson, 443 U.S. at 319.  Viewing the evidence as a whole in the light most favorable

2   to the verdict, McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994), the court's determination

3   that the identification evidence was sufficient was not unreasonable.

4           The California Court of Appeal's determination that the evidence was sufficient for a

5   rational jury to find the requisite intent for a conviction for attempted murder on counts two

6   through four was an objectively reasonable application of clearly established law, based on a

7   reasonable construction of the evidence.  Accordingly, Section 2254(d) bars relief.

8       II.       Claim Two:  Impermissibly Suggestive Photographic Line-Up

9               A.  Petitioner's Allegations and Pertinent State Court Record

10          Petitioner claims his due process right to a fair trial was violated by the admission of

11  identifications based on an impermissibly suggestive photographic line-up.  ECF No. 1 at 4, ECF

12  No. 21 at 18.  Petitioner alleges that the appearances of the "fillers" for the photographic line-up

13  caused him to "unduly stand out."  ECF No. 21 at 23.  Petitioner also asserts various pretrial

14  identification procedures were impermissibly suggestive.  See ECF No. 21 at 22-23.  Petitioner

15  does not discuss the reliability of the in-court identifications, instead limiting his argument to the

16  allegedly impermissible suggestibility of the photographic line-up.

17          At a pretrial evidentiary hearing, the trial court found that the photographic line up was

18  not impermissibly suggestive.  1 RT 44.  The line-up consisted of six photographs, commonly

19  called a "six pack" in police parlance.  1 RT 18-26.  Petitioner, featured in picture three, was

20  described as a black male, five feet six inches tall, weighing 160 pounds, with his hair in corn row

21  braids.  1 RT 18.  Kevin Howland, a former Sacramento County police officer with experience

22  creating photographic line-ups, testified on behalf of petitioner that the "most steadfast rule" in

23  designing photographic line-ups is to make sure the suspect does not "unduly stand out."  1 RT 6.

24  Mr. Howland testified that in his opinion there were "numerous problems" with the six-pack line-

25  up shown to victims in this case.  1 RT 20.  For example, while petitioner is a black male, the man

26  in picture number one was a "very, very light-skinned Hispanic male."  1 RT 21.  And while

27  petitioner had corn row braids and was described by some witnesses as having dreadlocks, the

28  men in pictures number four and five both had very short hair.  1 RT 23-24.  According to Mr.

1    Howland, the different appearances of these fillers transformed the "six pack" into a "three pack."

2    1 RT 25.

3          The court found that whatever shortcomings the six-person line-up presented were issues

4    to be considered by the jury, not issues preventing the line-up's admissibility.  1 RT 43-45; 1 CT

5    260-261.[12]  The court noted that defense counsel only challenged the appearance of the line-up,

6    not its administration.  1 RT 39.

7          During the trial, petitioner was identified in court as the shooter by victim Charles Walker

8    and witness Devon Washington.  1RT 96-97, 1 RT 200-201.  Charles testified he knew petitioner

9    prior to the shooting because he met him in his aunt's apartment, had seen him "a couple times in

10   the neighborhood," and bought marijuana from him in the past.  1 RT 111, 97, 108.  Devon also

11   knew petitioner for roughly a year prior to the shooting because he purchased marijuana from

12   him.  1 RT 200-201.  Jason Lyle testified that he was at the Azure Park Apartments the night of

13   the shooting to buy marijuana from petitioner.  3 RT 608-609.  Although he did not witness the

14   shooting, he testified that after he bought the marijuana, petitioner left and Lyle then heard

15   gunshots.  3 RT 611.  Minutes later, petitioner returned, wearing gloves and holding a gun.  3 RT

16   612.  Mr. Howland also testified for the jury on his opinion regarding the line-up's shortcomings,

17   repeating much of his pretrial testimony.  4 RT 966.  The jury was given standard jury

18   instructions regarding witness identifications and how to evaluate them.  4 RT 1015-1016, 1020-

19   1024; 2 CT 321-322, 323-324.

20              B.  The Clearly Established Federal Law

21         An identification based on a photographic line-up violates a defendant's due process

22   rights when "the identification procedure [is] so impermissibly suggestive as to give rise to a very

23   substantial likelihood of irreparable misidentification."  Simmons v. United States, 390 U.S. 377,

24   384 (1968).  An unduly suggestive line-up alone does not necessarily violate due process; it is the

25   likelihood of misidentification, under the "totality of the circumstances," that constitutes a

26   violation.  Neil v. Biggers, 409 U.S. 188, 198-99 (1972).  A line-up only violates due process if it

27

28   _____
     [12]  "CT" refers to the Clerk's Transcript on Appeal, Volume One ("1 CT") and Volume Two ("2 CT").

                                          13

is both impermissibly suggestive, and the resulting identification lacks reliability.  <u>Manson v. Brathwaite</u>, 432 U.S. 98, 106, 114 (1977).

To determine the reliability of identification testimony, courts must examine the totality of the circumstances.  <u>Id.</u> at 114.  Among the factors to consider are:  1) the witness' opportunity to view the criminal at the scene of the crime, 2) the witness' degree of attention, 3) the accuracy of the witness' prior description of the criminal, 4) the witness' level of certainty at the pretrial identification, and 5) the time between the crime and the pretrial identification.  <u>Biggers</u>, 409 U.S. at 199-200.

C.   <u>The State Court's Ruling</u>

Petitioner raised this claim on direct appeal.  The California Court of Appeal ruled as follows:

> Defendant contends reversal of all counts is necessary because his due process right to a fair trial was abridged when the trial court denied his motion to exclude his in-court and photo lineup identifications, which were shown to the witnesses, as impermissibly suggestive.  We find the motion was properly denied.

> "[A]n eyewitness identification at trial following a pretrial identification from a photo lineup is not precluded unless the photographic identification procedure is so impermissibly suggestive as to give rise to a substantial likelihood of misidentification."  (<u>People v. Ingle</u>, (1986) 178 Cal. App. 3d 505, 511–512.)

> Assuming for the sake of argument that the photo lineup used herein was suggestive, there was no substantial likelihood that the suggestiveness gave rise to defendant's having been misidentified as one of the shooters.  Charles Charles [*sic*] had personally met defendant at his aunt's apartment at the Azure Apartments, he was familiar with defendant as a seller of marijuana at the apartment complex, and he was within a few feet of defendant when defendant shot him.

> Devon Washington knew defendant because he had purchased marijuana from him.  Washington was just across the street from where the shooting took place and he recognized defendant when the muzzle flashes produced by the multiple shots that were fired illuminated defendant's face.

> Although Donnell did not, or would not, identify defendant in court, in an audio-video recording he told Detective Stewart that it was defendant who did the shooting and described defendant as wearing a black hoodie and gloves.

14

> Just before the shooting, Jason Lyle (who knew defendant) had driven to the Azure Apartments to buy marijuana from him. As Lyle got out of his car defendant walked over and sold Lyle some marijuana. Lyle thought defendant was wearing "maybe dark-colored clothing." Defendant told Lyle to "hold on real quick" and left. A few minutes later, as Lyle waited, he heard gunshots. Defendant returned along with a man in a wheelchair. Defendant was wearing gloves and carrying a gun. Defendant and his companion got into Lyle's car, and defendant said, "Let's go." When Lyle did not respond, defendant and his companion got out of the car and left.

> Given the foregoing, overwhelming evidence, there is no substantial likelihood that any suggestiveness in the photo lineup gave rise to a substantial likelihood of mistaken identity of the in-court identifications.

Lodged Doc. 4 at 3.

### D. Objective Reasonableness Under § 2254(d)

The California Court of Appeal applied the correct standard of review and did so reasonably. The court reasoned that even assuming, arguendo, that the photographic line-up was impermissibly suggestive, it did not result in an unreliable identification of petitioner at trial. In support of its conclusion, the court emphasized that both Charles Walker and Devon Washington, who identified petitioner in court as the shooter, personally knew petitioner prior to the shooting; that Charles was only a few feet away from the shooter; and that Devon was across the street at the time of the shooting and saw the shooter's face illuminated by the muzzle flashes. These factors touch on the witness's opportunity to observe the suspect at the scene of the crime, and the fact that both Charles Walker and Devon Washington knew petitioner weighs against the possibility of an "irreparable misidentification." See United States v. Wade, 388 U.S. 218, 241 n.33 (1967) (factors such as how well the witness knows the suspect "have an important bearing upon the true basis of the witness' in-court identification."). In addition, although not mentioned by the California Court of Appeal, the day after the shooting Devon Washington told the building manager he was "100 percent" sure he saw petitioner commit the shooting, later telling police his level of certainty was 65 percent. 2 RT 394; 3 RT 845. Other factors weigh against reliability: the scene of the crime was dark due to the lack of illuminating street lights, 1 RT 184; the day after the shooting, while still in the hospital, Charles identified two different photographs in the

15

1    line-up, neither of whom was petitioner, 3 RT 849; when Charles did identify petitioner, it was

2    more than two months after the shooting, 3 RT 854; and Devon stated petitioner was wearing a

3    black hooded sweatshirt during the shooting, 1 RT 205.

4        A court must examine the totality of the circumstances to determine the reliability of

5    identification testimony.  United States v. Field, 625 F.2d 862, 866 (9th Cir. 1980).  The court

6    must then weigh the factors of reliability against the "corrupting effect of the suggestive pretrial

7    identification procedure."  United States v. Barrett, 703 F.2d 1076, 1085 (9th Cir. 1983) (citing

8    Manson, 432 U.S. at 114).  Here, even though the California Court of Appeal did not expressly

9    examine each factor outlined in Biggers, its conclusion -- that there was "no substantial likelihood

10   that any suggestiveness in the photo lineup gave rise to a substantial likelihood of mistaken

11   identity of the in-court identifications," Lodged Doc. 4 at 3 -- is not objectively unreasonable

12   given the totality of the circumstances and the evidence presented at trial, particularly the fact that

13   Devon and Charles knew petitioner prior to the shooting.  The court's conclusion is further

14   supported by the fact that Mr. Howland was able to testify about the potential risks of the

15   photograph line-up.  See Simmons, 390 U.S. at 384 (the danger of misidentification "may be

16   substantially lessened by…expos[ing] to the jury the method's potential for error.").  Further,

17   petitioner offers no argument that the in-court identifications were unreliable under the standards

18   set forth in Manson and Biggers.

19       The court of appeal's determination that there was no substantial likelihood of

20   misidentification was an objectively reasonable application of clearly established law, based on a

21   reasonable interpretation of the evidence.  Accordingly, Section 2254(d) bars relief.

22   III.    Claim Three:  Failure to Instruct the Jury on the Lesser Charge of Attempted

23           Voluntary Manslaughter

24           A. Petitioner's Allegations and Pertinent State Court Record

25       Petitioner alleges that the trial court's failure to instruct the jury, sua sponte, on the lesser

26   included offense of attempted voluntary manslaughter violated his due process rights under the

27   Fourteenth Amendment.  ECF No. 1 at 5, ECF No. 21 at 27.  Petitioner asserts that evidence at

28   trial supported either a "heat of passion" or "imperfect self-defense" theory of attempted

16

1   voluntary manslaughter.  ECF No. 21 at 28-29.  Petitioner, citing Mullaney v. Wilbur, 421 U.S.

2   684 (1975), argues that the failure to instruct on attempted voluntary manslaughter relieved the

3   prosecution of its "burden of persuasion on [the] essential element of malice."  Id. at 30.

4           In California, an attempted murder charge may be reduced to attempted voluntary

5   manslaughter when a "defendant acts upon a sudden quarrel or heat of passion on sufficient

6   provocation, or kills in the unreasonable, but good faith, belief that deadly force is necessary in

7   self-defense."  People v. Lee, 20 Cal. 4th 47, 59 (1999) (citations omitted).  In both instances, the

8   malice usually required for manslaughter is presumptively absent.  Id.  The jury instruction for

9   "heat of passion" requires that the defendant acted under provocation that is neither "slight" nor

10   "remote" and must be judged according to how a "person of average disposition" would react in

11   the same situation.  See CALCRIM 603.[13]  "Imperfect self-defense" requires that a defendant

12   acted in the belief that he was in immediate danger of being killed or suffering great bodily injury

13   and that the immediate use of deadly force was necessary to defend himself, but at least one of

14   these beliefs was unreasonable.  See CALCRIM 604.  Per this instruction, "belief in future harm

15   is not sufficient, no matter how great or how likely the harm is believed to be."  Id.

16           The main defense strategy at trial was that petitioner was not the shooter.  Defense

17   counsel sought to establish reasonable doubt by pointing to the lack of physical evidence linking

18   petitioner to the scene, 4 RT 1079, by questioning the reliability of the witnesses, 4 RT 1080-

19   1081, and by suggesting petitioner had an alibi during the time of the shooting, 4 RT 1078.

20   During the trial, petitioner did not take the stand and the only evidence of his state of mind the

21   night of the shooting was introduced through Syra Drones's testimony.  See 2 RT 572 (petitioner

22   allegedly told Ms. Drones "to shut up, calm down and quit lying" after she was assaulted by one

23   of the victims).

24           To establish possible motives, the prosecution introduced evidence that petitioner may

25   have been angered when one of the victims assaulted Ms. Drones, 3 RT 759, and that Ms. Drones

26   told petitioner that the victims were planning to rob him sometime in the future, 2 RT 565.

27

28   [13]  CALCRIM refers to the Judicial Council of California Criminal Jury Instructions.

1   Petitioner now cites this evidence in support of his claim that there was sufficient evidence to

2   support a "heat of passion" or "imperfect self-defense" jury instruction.  ECF No. 12 at 28-29.

3   However, the defense did not request a jury instruction on attempted voluntary manslaughter and

4   never referred to a possible "heat of passion" or self-defense theory.  Although defense counsel

5   requested jury instructions on a lesser-related offense of assault with a firearm (California Penal

6   Code § 245 (a)(2)), 4 RT 1006, the trial court denied the request and instructed the jury on

7   attempted murder according to CALCRIM No. 600,[14] in addition to other standard jury

8   instructions, <u>see</u> 4 RT 1006-1007; 2 CT 319-331.  The defense did not object to the attempted

9   murder instruction.  4 RT 1006.

10                  B.  The Clearly Established Federal Law

11          There is no clearly established federal law requiring that a state trial court instruct a jury

12   on a lesser included offense in a non-capital case.  It is clearly established that a defendant in a

13   *capital* case has a constitutional right to a jury instruction on a lesser included offense if there was

14   evidence to support the instruction.  <u>Beck v. Alabama</u>, 447 U.S. 625 (1980).  The Supreme Court,

15   however, expressly declined to decide whether this right extends to defendants charged with non-

16   capital offenses.  <u>Id.</u> at 638 n.14.  Since <u>Beck</u>, the Supreme Court has not addressed the question,

17   and the Ninth Circuit has held that "the failure of a state court to instruct on a lesser offense [in a

18   non-capital case] fails to present a federal constitutional question and will not be considered in a

19   federal habeas corpus proceeding."  <u>Solis v. Garcia</u>, 219 F.3d 922, 929 (9th Cir. 2000) (per

20   curiam).[15]

21   _____

22   [14]  <u>See</u> footnote 10, <u>supra</u>, for text of CALCRIM 600.
    [15]  Prior to the passage of the AEDPA, the Ninth Circuit left open the possibility of relief when a

23   state court denies a lesser included offense instruction when it clearly constitutes a theory of the
    defense.  In <u>Bashor v. Risley</u>, 730 F.2d 1228, 1240 (9th Cir. 1984), the Ninth Circuit held that a

24   trial court's refusal to instruct the jury on a lesser included offense may interfere with due process
    rights when "the criminal defendant is…entitled to adequate instructions on his or her theory of

25   defense."  <u>Id.</u>  However, in <u>Bashor</u>, the court found no fundamental unfairness because the
    defendant did not request the lesser included offense instruction, and the instruction was

26   inconsistent with the defense strategy.  <u>Id.</u>  Moreover, "circuit precedent does not constitute

27   'clearly established Federal law, as determined by the Supreme Court,'…[and] therefore cannot
    form the basis for habeas relief under AEDPA."  <u>Parker v. Matthews</u>, 132 S. Ct. 2148, 2155

28   (2012).

Errors in instructing the jury can only support federal habeas relief if they "so infect[] the entire trial that the resulting conviction violates due process." Estelle v. McGuire, 502 U.S. 62, 71 (1991). Allegedly erroneous instructions "must be considered in the context of the instructions as a whole and the trial record." Estelle, 502 U.S. at 72. Additionally, "it is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." Henderson v. Kibbe, 431 U.S. 145, 154 (1977). In challenging the failure to give an instruction, a habeas petitioner faces an "especially heavy" burden because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Henderson, 431 U.S. at 155.

C. The State Court's Ruling

Petitioner raised this claim on direct appeal. The California Court of Appeal ruled as follows:

> Defendant contends the trial court committed reversible error when it failed to instruct the jury, sua sponte, on the included offense of attempted voluntary manslaughter based upon heat of passion. We disagree.
>
> "Voluntary manslaughter is a lesser included offense of murder. One form of the offense is defined as the unlawful killing of a human being without malice aforethought 'upon a sudden quarrel or heat of passion.' (§ 192, subd. (a).) 'The heat of passion requirement for manslaughter has both an objective and a subjective component. The defendant must actually, subjectively, kill under the heat of passion. But the circumstances giving rise to the heat of passion are also viewed objectively. As we explained long ago in interpreting the same language of section 192, 'this heat of passion must be such passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances....'" (People v. Cole, (2004) 33 Cal. 4th 1158, 1215–1216.)
>
> Defendant argues that Donnell's assault on Drones about which she immediately told him, angered defendant and he left the apartment within minutes of her telling him. Additionally, Drones testified she had been assaulted by Donnell because she purportedly told defendant that "these guys were going to rob him."
>
> The argument is unpersuasive. A reasonable person, upon hearing that his girlfriend has been slapped or punched, does not arm himself with a firearm, find a companion who is similarly armed, and seek out and attempt to kill the assailant and those associated with him. And even assuming, at some undisclosed point in the past, Drones told defendant that Charles and his companions were

1

2

3

4

5

6

> planning on robbing him, a lethal preemptive strike against them is not a legal or reasonable response.  Simply put, there was no evidentiary basis for a heat of passion instruction, and hence there was no error in not giving one.  "It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case."  (People v. Guiton, supra, 4 Cal. 4th at p. 1129.)  Because the evidence was insufficient to give rise to a reasonable heat of passion instruction, there was no basis for the giving of an instruction on attempted voluntary manslaughter and the court cannot be faulted for not giving such an instruction.

7   Lodged Doc. 4 at 3-4.

8         D.   Objective Reasonableness Under § 2254(d)

9         First, to the extent petitioner's claim relies on state law, see ECF No. 21 at 28, his claim is

10   not cognizable on federal habeas review.  See Estelle, 502 U.S. at 67-68 (in conducting federal

11   habeas review, federal courts may not "reexamine state-court determinations on state-law

12   questions").  The right to a lesser included offense instruction turns on state law.  See People v.

13   Breverman, 19 Cal. 4th 142, 165 (1998) (the right to a sua sponte instruction on lesser included

14   offenses arises exclusively from state law).  Therefore, even if the trial and appellate courts erred,

15   petitioner could not prevail because errors of state law are not reviewable in a Section 2254

16   proceeding.  See Estelle, 502 U.S. at 68.

17         Second, the California Court of Appeal's analysis cannot be considered objectively

18   unreasonable because the Supreme Court has not clearly established any constitutional right to a

19   lesser included offense in a non-capital case.  Where the Supreme Court has not clearly

20   established the right asserted, Section 2254(d) precludes relief.  See Carey v. Musladin, 549 U.S.

21   70, 77 (2006).  It has long been established in the Ninth Circuit that the failure of a state court to

22   instruct on a lesser included offense does not present a federal constitutional question and

23   therefore cannot provide a basis for habeas relief.  Solis, 219 F.3d at 929; see also Tolbert v.

24   Page, 182 F.3d 677 (9th Cir. 1999) (finding application of Beck to non-capital cases is barred by

25   Teague v. Lane, 489 U.S. 288 (1989)).

26         Third, even if clearly established federal law entitled a state criminal defendant to

27   instructions on his or her theory of defense, as suggested by the Ninth Circuit, petitioner is not

28   ////

1    entitled to relief.  Like the defendant in <u>Bashor v. Risley</u>, 730 F.2d 122 (9th Cir. 1984),[16]

2    petitioner did not request an instruction on attempted voluntary manslaughter and the trial record

3    does not suggest either a "heat of passion" or "imperfect self-defense" strategy.  The defense

4    pursued an all-or-nothing strategy, maintaining that petitioner was not the shooter and attacking

5    the credibility of the witness identifications and testimony.  A review of the record reveals no

6    mention of either ground for attempted voluntary manslaughter.  The failure of the trial court to

7    sua sponte instruct on attempted voluntary manslaughter under either theory cannot be considered

8    a violation of the petitioner's right to present a defense.

9         For the same reason, petitioner's reliance on <u>Mullaney v. Wilbur</u>, <u>supra</u>, is misplaced.

10   Due process requires the prosecution to prove the absence of heat of passion "when the issue is

11   properly presented."  <u>Mullaney</u>, 421 U.S. at 704.  In <u>Mullaney</u>, the defendant claimed he attacked

12   the victim in a heat of passion.  <u>Id.</u> at 685.  Here, petitioner did not present evidence of either

13   "heat of passion" or "imperfect self-defense," and thus the prosecution was not required to prove

14   their absence.

15        Finally, petitioner has not met the high burden of proving that the failure to give the lesser

16   included instructions "so infected the entire trial" as to deprive him of his federal due process

17   rights.  As found by the California Court of Appeal, the record reveals no evidentiary basis that

18   would support either instruction.  Further, "a state trial court's finding that the evidence does not

19   support a claim of imperfect self-defense is entitled to a presumption of correctness on federal

20   habeas review."  <u>Menendez v. Terhune</u>, 422 F.3d 1012, 1029 (9th Cir. 2005).  Petitioner has not

21   provided evidence to rebut that presumption.

22        For these several reasons, petitioner's challenge to the trial court's failure to instruct sua

23   sponte on the lesser included offense of attempted voluntary manslaughter cannot support habeas

24   relief.

25   ////

26   ////

27

28   ───────────────────────
     [16]  <u>See</u> footnote 15, <u>supra</u>.

IV.     Claim Four:  Prosecutorial Misconduct

        A. Petitioner's Allegations and Pertinent State Court Record

Petitioner claims the prosecutor made certain statements during his closing argument that violated his due process right to a fair trial.  ECF No. 1 at 5, ECF No. 21 at 31.  Petitioner asserts the prosecutor "made comments that were an emotional appeal to societal pressure that contained facts not supported by the record."  ECF No. 21 at 31.  Additionally, petitioner argues that the prosecutor "suggested that witnesses had risked their lives by coming to testify, a fact not supported by any evidence implying [p]etitioner had threatened or posed a threat to those witnesses," an implication that gave witnesses "unwarranted credibility."  ECF No. 21 at 31.

During his closing argument, the prosecutor invited the jury to use common sense in evaluating the evidence.  4 RT 1124-1125.  To illustrate how the jurors should go about this, he suggested they imagine themselves sitting in a coffee shop, explaining the case to a friend.  4 RT 1123.  Petitioner challenges the following portion of the prosecutor's argument:

> "[Prosecutor]:  You can tell your friend about all the motivations, all the witnesses. At the end your friend will say, what was your decision?  What did you do?
>
> You can sit there and say, we acquitted him, we found him not guilty. *Your friend will look at you sort of cross-eyed and say, well, you just told me about all this evidence, and talked to me about witnesses and explained why they were lying and the fact they could be killed if they identified someone and, yet, some came in and testified despite all of that.*
>
> The reason I tell this story is, when you are sitting down in a coffee shop explaining to a friend and you are using your common sense and laying out the picture the way you think about things and the way things interrelate.  Don't change simply because you are a juror now.
>
> [DEFENSE COUNSEL]:  I will object.  It is improper.
>
> THE COURT:  Overruled.
>
> [PROSECUTOR]:  Your common sense that you apply in a coffee shop in terms of why would he have a motive to do this?  This timing works out.  All of those things apply equally here.  Don't think differently in terms of applying your common sense just because you are a juror."

Lodged Doc. 1 at 58-59.  (Italics added by petitioner.)

22

1   Respondent contends that petitioner's prosecutorial misconduct claim is defaulted because

2   the California Court of Appeal rejected it on procedural grounds, finding that defense counsel's

3   objection did not satisfy California's "contemporaneous objection" rule.  ECF No. 13 at 24.

4   Respondent contends, alternately, that the court properly rejected petitioner's claim on the merits.

5   In response petitioner argues, for the first time, that his trial attorney's failure to properly object

6   constitutes ineffective assistance of counsel, reviewable under the standards of Strickland v.

7   Washington, 466 U.S. 668 (1984).  ECF No. 21 at 32.

8         B.  The Clearly Established Federal Law

9   A prosecutor's improper statements violate the Constitution only where they "so infect[]

10   the trial with unfairness as to make the resulting conviction a denial of due process."  Darden v.

11   Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643

12   (1974) (internal quotation marks omitted)).  It is not enough that the remarks were "undesirable or

13   even universally condemned."  Darden, 477 U.S. at 181.  Fundamental fairness must be assessed

14   in context of the trial as a whole, including the weight of the evidence, the defense opportunity to

15   respond, and the instructions given to the jury.  Id. at 181-82.

16         C.  The State Court's Ruling

17   Petitioner raised his prosecutorial misconduct claim on direct appeal.  After recounting the

18   pertinent trial court record, the California Court of Appeal ruled as follows:

19
20
21
      First, "'[a]s a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.'"  (People v. Hill, (1998) 17 Cal. 4th 800, 820.)
22
23
24
25
Defense counsel's interjection, "I will object.  It is improper," falls far short of specifying any ground for the objection.  Indeed, every objection is based upon something that the objector deems improper, otherwise there would be no basis whatsoever for the objection.  Because the objection that whatever is being challenged is "improper" fails to specify any basis for the objection, the issue is forfeited for appeal.

26
27
28
      Second, even if the objection were not forfeited, we would find it meritless as it is argued by defendant.  Noting that "[a] warning of probable consequences of failure to convict, and of the unfavorable reactions of neighbors is improper" (People v. Purvis, (1963) 60 Cal. 2d 323, 342), defendant argues "the prosecutor's comment was a clear suggestion that the jury should consider the reaction from

their friends" in determining defendant's guilt.

Contrary to defendant's interpretation of the prosecutor's comment, the comment was an attempt to explain to the jurors that they should use their common sense in determining the facts and the inferences to be drawn therefrom. Indeed, the prosecutor expressly disavowed defendant's interpretation of his argument when, prior to making the challenged argument, he told the jury: "I do not tell this story or give this analogy to make you think that you should worry about what your neighbor thinks about your decision or ultimately what you decide to do in this case...." Moreover, the court instructed the jury: "You must decide what the facts are. It is up to all of you, and you alone, to decide what happened, *based only on the evidence that has been presented to you in this trial.* [¶] Do not let bias, sympathy, prejudice, *or public opinion* influence your decision." (Italics added.)

Defendant offers no reason to believe the jurors did not heed the admonitions and instructions. (See People v. Sanchez, (2001) 26 Cal. 4th 834, 852 [in the absence of evidence to the contrary, appellate court presumes the jury understood and followed the court's instructions].) Consequently, defendant's contention is rejected.

Lodge Doc. 4 at 4-5.

### D. Procedural Default

As a general rule, "[a] federal habeas court will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" Walker v. Martin, 131 S.Ct. 1120, 1127 (2011) (quoting Beard v. Kindler, 558 U.S. 53, 55 (2009)); Calderon v. United States District Court (Bean), 96 F.3d 1126, 1129 (9th Cir. 1996) (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)). The fact that the state court alternatively ruled on the merits does not erase the effect of a procedural bar. Harris v. Reed, 489 U.S. 255, 264 n.10 (1989).

Procedural default is an affirmative defense and the burden of proving the adequacy of a state procedural bar rests with the state. Bennett v. Mueller, 322 F.3d 573, 585-86 (9th Cir. 2003). To qualify as adequate, the rule must be well established and consistently applied. Walker, 131 S.Ct. at 1128; Beard, 558 U.S. at 59; Greenway v. Schriro, 653 F.3d 790, 797-98 (9th Cir. 2011); Poland v. Stewart, 169 F.3d 575, 577 (9th Cir. 1999). A state procedural rule is "consistently applied and well-established if the state courts follow it in the 'vast majority of cases.'" Scott v. Schriro, 567 F.3d 573, 580 (9th Cir. 1994). "Once the state has adequately pled

24

1    the existence of an independent and adequate state procedural ground as an affirmative defense,

2    the burden to place that defense in issue shifts to the petitioner."  Bennett, 322 F.3d at 586.

3          "Under Section 353 of the California Evidence Code, also known as the

4    'contemporaneous objection rule,' evidence is admissible unless there is an objection, the grounds

5    for the objection are clearly expressed, and the objection is made at the time the evidence is

6    introduced."  Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002).  Under the rule, California

7    courts construe broadly the sufficiency of objections that preserve issues for appellate review,

8    focusing on whether the trial court had a reasonable opportunity to rule on the merits of the

9    objection.  Id.  It has been the law of the Ninth Circuit for thirty-five years that California's

10   "contemporaneous objection" rule is both independent and, at least where a party has failed to

11   make any objection at all, adequate to support default.  Garrison v. McCarthy, 653 F.2d 374, 377

12   (9th Cir. 1981).  The rule will also act as a procedural bar when the objection at trial was not

13   specific to the constitutional violation now claimed.  See Davis v. Woodford, 384 F.3d 628, 654

14   (9th Cir. 2004) (finding the petitioner's constitutional claim procedurally barred because he

15   "raised only an evidentiary, not a constitutional, objection at trial.").

16         Here, respondent argues the "contemporaneous objection" rule is adequate by citing to

17   cases where parties failed to make a timely objection.[17]  ECF No. 13 at 24.  These cases are

18   distinguishable from the case at hand, where petitioner's counsel did object to the prosecutor's

19   statements and the trial court overruled the objection.  Nevertheless, in his traverse, petitioner

20   fails to address whether California's "contemporaneous objection" rule is an adequate procedural

21   bar under these circumstances.  Because he fails to address the adequacy of the rule, petitioner's

22   claim is procedurally barred unless he can show either:  (1) cause for the default and actual

23   prejudice as a result of the alleged violation of federal law; or (2) that failure to consider the

24   claims will result in a fundamental miscarriage of justice.  Edwards v. Carpenter, 529 U.S. 446,

25

26   [17]  Respondent cites Paulino v. Castro, 371 F.3d 1083, 1093 (9th Cir. 2004) (applying procedural
     default where defense counsel did not contemporaneously object to a jury instruction); and

27   Vansickel v. White, 166 F.3d 953, 957-58 (9th Cir. 1999) (finding the "contemporaneous
     objection" rule adequate where defense counsel failed to contemporaneously object to the trial

28   court's denial of half the defendant's statutory allotment of peremptory challenges).

1   451 (2000); Coleman, 501 U.S. at 749-50.

2                    E.   Cause and Prejudice

3          "Cause" for procedural default "must be something external to the petitioner, something

4   that cannot fairly be attributed to him."  Coleman, 501 U.S. at 753.  Trial counsel's "ignorance or

5   inadvertence" cannot constitute "cause" under this rule "because the attorney is the petitioner's

6   agent when acting, or failing to act, in furtherance of the litigation."  Id. (citing Murray v. Carrier,

7   477 U.S. 478, 488 (1986)).  However, ineffective assistance of counsel can, if pleaded and

8   proved, establish cause for default.  Carrier, 477 U.S. at 488 (1986).  Counsel must be

9   constitutionally ineffective under the standard established in Strickland v. Washington, 466 U.S.

10  668 (1984).  Id.  But, "an ineffective-assistance-of-counsel claim asserted as cause for the

11  procedural default of another claim can itself be procedurally defaulted."  Edwards, 529 U.S. at

12  453.

13         To establish "prejudice" the "habeas petitioner must show 'not merely that the errors

14  at…trial created a possibility of prejudice, but that they worked to his actual and substantial

15  disadvantage, infecting his entire trial with error of constitutional dimensions.'"  Carrier, 477 U.S.

16  at 494 (omission and emphasis in original) (quoting United States v. Frady, 456 U.S. 152, 170

17  (1982)).  "Prejudice [to excuse a procedural default] is actual harm resulting from the alleged

18  error."  Vickers v. Stewart, 144 F.3d 613, 617 (9th Cir. 1998) (citing Magby v. Wawrzaszek, 741

19  F.2d 240, 244 (9th Cir. 1984)).

20         Petitioner does not offer any evidence that he suffered actual prejudice, apart from the

21  general allegation that the prosecutor's statements "impacted petitioner's due process right to a

22  fair trial."  ECF No. 21 at 31.  It is therefore unnecessary to address his unexhausted claim of

23  ineffective assistance of trial counsel.  See Frady, 456 U.S. at 168 (if the petitioner cannot

24  demonstrate either "cause" or "prejudice," it is unnecessary for the court to address the other

25  requirement).  Consequently, petitioner has failed to overcome the procedural bar, as he has not

26  ////

27  ////

28

                                                    26

1    argued alternatively that this court's failure to consider his prosecutorial misconduct claim will

2    result in a fundamental miscarriage of justice.[18]

3            F.   Objective Reasonableness Under § 2254(d)

4       Because petitioner's prosecutorial misconduct claim is procedurally defaulted, discussion

5    of the state court's decision is unnecessary. However, the undersigned notes that even if the

6    prosecutorial misconduct claim were not defaulted, petitioner could not succeed on the merits

7    because the California Court of Appeal's alternate ruling was objectively reasonable and not

8    contrary to clearly established federal law.[19]

9       In its alternate ruling, the state court determined that petitioner's prosecutorial misconduct

10    claim was meritless because the prosecutor's statements were reasonably interpreted as "an

11    attempt to explain to the jurors that they should use their common sense." Lodged Doc. 4 at 5. In

12    rejecting petitioner's contention of misconduct, the court cited the prosecutor's prior statement

13    expressly cautioning the jury not to "worry about what your neighbor thinks about your decision,"

14    and the fact that the jury was instructed not to let public opinion influence their decision. Id.

15    Juries are presumed to follow the instructions given by the court. Weeks v. Angelone, 528 U.S.

16    225, 234 (2000). Additionally, "arguments of counsel generally carry less weight with a jury than

17    do instructions from the court." Boyde v. California, 494 U.S. 370, 384 (1990). It is thus

18

19    [18] To show that a failure to consider the merits of a claim would result in a fundamental

20    miscarriage of justice, a petitioner must establish factual innocence. See Smith v. Murray, 477 U.S. 527, 537 (1986); Smith v. Baldwin, 510 F.3d 1127, 1139-40 (9th Cir. 2007); Gandarela v.

21    Johnson, 286 F.3d 1080, 1085-86 (9th Cir. 2002); Wildman v. Johnson, 261 F.3d 832, 842-43 (9th Cir. 2001). "This standard is not easy to meet," Gandarela, 286 F.3d at 1086, and is "very

22    narrow," Sawyer v. Whitley, 505 U.S. 333, 341 (1992). A review of petitioner's traverse shows one mention of actual innocence, in the section on claim three. ECF No. 21 at 24. However, it

23    reads in its entirety: "the foregoing is not a concession or deviation as to [p]etitioner's claim of innocence…." This statement, absent any showing that it is "more likely than not that no

24    reasonable juror would have convicted the petitioner in the light of the new evidence," Paradis v. Arave, 130 F.3d 385, 396 (9th Cir. 1997), is insufficient to overcome the procedural bar.

25    [19] District courts retain the discretion to determine a petition on its merits, bypassing an asserted

26    procedural defense, where the underlying claims are clearly not meritorious. See Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) (citing Lambrix v. Singletary, 520 U.S. 518, 525

27    (1997)). To the extent if any that further proceedings regarding procedural default might otherwise be appropriate, the undersigned would decline to pursue them in light of the analysis

28    above.

1    appropriate to presume the jury heeded the trial court's repeated admonitions to consider only the

2    evidence, not public opinion.  Further, defense counsel did in fact object, although in a very

3    general manner, alerting the jury that he found the prosecutor's statements "improper."  4 RT

4    1125.  Given these considerations, in the context of the trial as a whole, the court reasonably

5    determined that there was no fundamental unfairness.

6        In its decision, the California Court of Appeal did not reference petitioner's allegation that

7    the prosecutor's statements were "aggravated by the suggestion that one or more witnesses had

8    risked their lives by coming in to testify, a fact not supported by any evidence."  Lodged Doc. 1 at

9    61.  State courts are not required to address every argument made by a petitioner, however, and

10   absent any indication to the contrary, the state court's adjudication is presumed to be "on the

11   merits."  See Richter, 131 S. Ct. at 784-85; see also Lee v. Comm'r, Alabama Dep't of Corr., 726

12   F.3d 1172, 1211 (11th Cir. 2013) (finding the state court was not required to discuss every fact

13   and argument raised in a habeas petitioner because it made implicit factual findings in rejecting

14   the petitioner's claim).  It is not unreasonable, in light of the trial record here, to reject

15   characterization of the cited prosecutorial statements as misconduct.  The trial transcript implies

16   that the prosecutor was commenting on the potential consequences of "snitching" in the

17   witnesses' neighborhoods, an issue that was raised by witness testimony.  See 4 RT 1037; 1 RT

18   217-18.  Therefore, these statements did not involve "facts outside the record," as petitioner

19   contends.  See ECF No. 21 at 31.

20       In sum, even if the prosecutorial conduct claim were not defaulted, the California Court of

21   Appeal reasonably rejected petitioner's claim that the prosecutor improperly referenced societal

22   pressure during his closing argument.  The prosecutor's statement about explaining the case to a

23   friend in a coffee shop may have been poorly worded.  When considered in context, however, it

24   did not so infect the trial with unfairness as to constitute a denial of due process.  Accordingly,

25   petitioner's claim of prosecutorial misconduct cannot support habeas relief.

26                                CONCLUSION

27       For all the reasons explained above, the state courts' denial of petitioner's claims was not

28   objectively unreasonable within the meaning of 28 U.S.C. § 2254(d).  Even without reference to

1    AEDPA standards, petitioner has not established any violation of his constitutional rights.

2    Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be

3    denied.

4         These findings and recommendations are submitted to the United States District Judge

5    assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l).  Within twenty-one days

6    after being served with these findings and recommendations, any party may file written

7    objections with the court and serve a copy on all parties.  Such a document should be captioned

8    "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

9    he shall also address whether a certificate of appealability should issue and, if so, why and as to

10   which issues.  <u>See</u> 28 U.S.C. § 2253(c)(2).  Any reply to the objections shall be served and filed

11   within fourteen days after service of the objections.  The parties are advised that failure to file

12   objections within the specified time may waive the right to appeal the District Court's order.

13   <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

14   DATED: March 9, 2016

15                                        _____

16                                        ALLISON CLAIRE
                                          UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

25

26

27

28